# Exhibit 1 to Notice of Removal
by Defendant Airgas USA LLC

DAVID KESTNER (SBN 275783)
LAW OFFICES OF DAVID KESTNER & ASSOCIATES, APC
PO Box 567
Monrovia, CA 91017
Tel.: 888-898-7322
Fax: 213-867-9945

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
**8/16/2024 10:45 AM**
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By Q. Dunbar, Deputy Clerk**

Attorney for Plaintiff Gallardo, LLC

## SUPERIOR COURT OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| GALLARDO, LLC, a California limited liability company,<br><br>      **Plaintiff,**<br><br>   v.<br><br>AIRGAS USA, LLC, an out of state limited liability company;<br><br>DOES 1 to 5.<br><br>      **Defendant** | Case No.: 24CMCV01249<br>(Unlimited)<br><br>**COMPLAINT FOR DAMAGES**<br>**CAUSES OF ACTION:**<br>  **1. DECLARATORY RELIEF; AND**<br>  **2. CONVERSION**<br><br>Judge: UNASSIGNED<br>Dept.<br>Time:<br>Date:<br>Trial: UNASSIGNED |

1. Plaintiff Gallardo, LLC is a California entity registered with the California Secretary of State.

   a. Gallardo, LLC's principal place of business is located in Pomona, California, in Los Angeles County.

   b. Gallardo, LLC is the owner and landlord of real property commonly known as 401 N. Long Beach Boulevard, Compton, California 90221 (hereafter "Compton Property").

2. Defendant Airgas USA, LLC (hereafter "Airgas") is a Delaware entity.

   a. Airgas rents the Compton Property from Gallardo, LLC.

3.  The Plaintiff is ignorant of the true names and capacities of Defendants sued as Does 1-5, inclusive, and therefore sue these Defendants by such fictitious names and capacities pursuant to CCP § 474. The Plaintiff is informed and believes, and on this basis alleges, that each fictitiously named Defendant is responsible in some manner for the alleged acts and failures to act, and that the Plaintiff's injuries were legally and proximately caused by the conduct of each such Defendant. Plaintiff will seek leave of the Court to amend this Complaint to allege their true identities, once the same are ascertained, as well as the manner in which each fictitiously named Defendant is responsible for the damages sustained by the Plaintiff.

4. The Plaintiff is informed and believes, and based thereon alleges, that at all times relevant to this Complaint, Defendants, and each of them, were acting as the agent, servant, employee, subsidiary, joint venturer, affiliate, partner, assignee, successor-in-interest, alter ego or other representative of each other, and were acting within the course and scope of their agency, servitude, employment, subsidy, joint venture, affiliation, partnership, assignment, succession, alter ego, and/or representation, with the full knowledge, consent, permission, authorization and ratification of both prior and ongoing acts, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

5. Numerous individuals and separate entities participated actively during the course of and in furtherance of the wrongdoing alleged and complained of herein. The individuals and entities acted pursuant to agreement and in concert with each other. They also acted as agents for principals.

---

**COMPLAINT FOR DAMAGES**

6. Jurisdiction is proper in the Superior Court in County of Los Angeles because:

    a. The relief sought: declaration of rights, and money damages;

    b. The amount in controversy exceeds the jurisdictional minimum of this Court;

    c. Contractual performance was in Los Angeles County;

    d. The Compton Property is in Los Angeles County.

7. The Compton Property is a commercial property comprised of 9,842 square feet in structure an 11,000 in yard. It has a retail store, offices, warehouse, storage rooms, four bulk gas tanks, and high-pressure filling station. The filling station allows the tenant to fill cylinders from bulk tanks at high pressure. This involves bulk tanks, cryogenic pumps, vaporizers, manifold and control panels. This equipment was installed on the property prior to 1991.

    a. The four bulk tanks are:

        i. Nine (9) ton carbon dioxide tank, serial numbered 762 and 11170;

        ii. Six thousand (6,000) gallon oxygen bulk tank, serial number TM6000 H1868, F612950RR;

        iii. Fifteen hundred (1,500) gallon argon bulk tank serial number 567, VCS 1500;

        iv. Fourteen hundred (1,400) gallon nitrogen bulk tank, serial number E3117, VT-3000.

8. Gallardo, LLC's bulk tanks are permitted by the City of Compton, which allows Gallardo, LLC's tenants to utilize the pumpstation. This adds value to property and raises the rental price.

**COMPLAINT FOR DAMAGES**

9. Gallardo, LLC purchased the Compton property in 2001, and leased it to Complete Cutting and Welding Supplies, Inc. (hereafter "CC&WS").

    a. CC&WS operated the filling station during the entirety of its lease, until it assigned its lease to Magnegas, LLC in 2019.(CC&WS lease is attached hereto as Attachment "A".)

10. Magnegas, LLC did an asset purchased CC&WS assets, including CC&WS' Compton Property lease.

11. At some point in time, prior to November 2022, Magnegas LLC's parent company Taronis Technologies, Inc. went into bankruptcy, case no. 22-11121. ("Taronis" hereafter refers to Taronis Technologies, Inc. and its subsidiaries Magnegas Real Estate Holdings, LLC (CA SOS entity n. 202030710006)Magnegas Welding Supply – Complete La, LLC (201813010383), and Magnegas Welding Supply – West, LLC.)

12. On or about November 16, 2022, in the subject bankruptcy case, Taronis filed a motion titled: *Motion of the Debtors for Entry of an Order (I) Authorizing the Private Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Sellers to Assume and Assign an Executory Contract, (III) Approving Bidder Protections, and (IV) Granting Other Related Relief, [Docket No. 40]*. The motion requests Traonis be allowed to sell some of its property to Defendant Airgas.

    a. This motion does not describe or mention any of Gallardo, LLC's property.

    b. It does delineate the difference between ownership interest and leasehold interest in containers. Page 62,section (a).

13. On November 18, 2022, counsel for Gallardo, LLC wrote Ms. Good counsel for Taronis an email concerning Gallardo, LLC's bulk tanks on the Compton Property. The email informed Ms. Good that the

1  bulk tanks were Gallardo, LLC's property. Counsel sent a subsequent

2  email detailing the fixtures that belong to Gallardo, LLC. Attached

3  hereto, as Attachment "B", and incorporated hereat as fully setforth

4  herein, is a true and correct copy of the subject emails.

5     14.    On November 30, 2022, Jeremy W. Rayan, counsel for Airgas,

6  responded to Gallardo, LLC's counsel's emails. His email erroneously

7  claims that Gallardo, LLC made conveyances to Taronis Technologies,

8  Inc. Counsel for Gallardo, LLC replied, explaining that Taronis did

9  not have the right to transfer Gallardo, LLC property. These emails

10  are a part of Attachment "B".

11     15.    On December 8, 2022, Taronis filed, in the its bankruptcy

12  case, a Notice Of Filing Of Revised Proposed Sale Order For

13  California Private Sale. Attached to Taronis' Notice is a document

14  titled: ASSET PURCHASE AGREEMENT by and among Airgas USA, LLC and

15  MAGNEGAS WELDING SUPPLY – WEST, LLC MAGNEGAS REAL ESTATE HOLDINGS,

16  LLC and TARONIS FUELS, INC.

17         a. This document does not describe any of Gallardo, LLC's

18           property.

19         b. This document generally refers to the property owned by

20           Taronis and its subsidiaries.

21         c. This document specifically excludes tanks. *Section*

22           *2.02(i)(i)*[sic].

23     16.    On December 12, 2022, the subject bankruptcy court issued

24  an order as to Taronis' motion to sell its assets to Airgas as

25  described in asset purchase agreement, which is attached to the

26  order. The purchase agreement specifically excludes tanks. *Section*

27  *2.02(i)(i)*[sic].

28     17.    On or about December 22, 2022, Taronis assigned the Compton

Property lease to Airgas.

a. Airgas removed the pumpstation, i.e. the cryogenic pumps, vaporizers, manifold and control panels.

b. Gallardo LLC demanded that Airgas return the pumpstation items to the Compton Property. Attached hereto as Attachment "C", and incorporated herein as fully setforth hereat, is a true and correct copy of Gallardo, LLC's demand.

c. Airgas claims that the subject Gallardo, LLC's property was sold to Airgas as part of Taronis asset purchase and has plans to remove the tanks.

d. Airgas wants to break its Compton Property lease, at the end of August 2024. It has offered to pay Gallardo, LLC for taking the tanks. Attached hereto as Attachment "D" are true and correct copies of email conversation concerning an increase in the price because Airgas wants to keep the bulk tanks.

18.    The subject Gallardo, LLC property is integral to the operating permits that the Compton Property has, and if Airgas removes Gallardo, LLC's bulk tanks there is a high degree of probability that the City of Compton will not grant/provide permits with different tanks.

19.    In proximate location to the Compton Property, Airgas operates three stores:

a. Airgas' Lynwood store, 2.7 miles from the Compton Property;

b. Airgas' Paramount store, 3.6 miles from the Compton Property;

c. Airgas' Carson store, 6.7 miles from the Compton Property.

20.    CC&WS and Magnegas were Airgas' competitors.

21.    Airgas' removal of the pumpstation and Gallardo, LLC's bulk tank reduces the ability of other tenants to offer services in

**COMPLAINT FOR DAMAGES**

1  competition with Airgas. It also increases Airgas' control over

2  filing cylinders and, as a result more control over the market.

### FIRST CAUSE OF ACTION

#### FOR

#### DECLARATORY RELIEF

#### Against all Defendants

7   22.    Plaintiff realleges each and every allegation previously

8  alleged as fully setforth herein.

9   23.    An actual controversy has arisen and now exists between

10 plaintiff and defendant concerning their respective rights and

11 duties: On the one hand, Plaintiff contends that it is the sole owner

12 of the bulk tanks, and if Defendant Airgas has an interest in the

13 tanks it is limited to a leasehold interest. On the other hand,

14 Defendant Airgas claims an undivided ownership interest in

15 Plaintiff's bulk tanks.

16  24.    The four bulk tanks are:

17        a. Nine (9) ton carbon dioxide tank, serial numbered 762 and

18           11170;

19        b.  Six thousand (6,000) gallon oxygen bulk tank, serial

20           number TM6000 H1868, F612950RR;

21        c. Fifteen hundred (1,500) gallon argon bulk tank serial

22           number 567, VCS 1500;

23        d. Fourteen hundred (1,400) gallon nitrogen bulk tank, serial

24           number E3117, VT-3000.

25  25.    Plaintiff desires a judicial determination of its rights

26 and duties, and a declaration as to what interest, in any, Airgas has

27 in these bulk tanks.

28  26.    A judicial declaration is necessary and appropriate at this

time under the circumstances in order that plaintiff may ascertain

its rights and duties as to the bulk tanks. A judicial determination would also reduce unnecessary waste and allow Gallardo, LLC to continue to operate the Compton Property with a pumpstation.

27.    The parties have meet and conferred to resolve this issue privately but were unable to come to a resolution.

**SECOND CAUSE OF ACTION**

**FOR**

**CONVERSION**

**Against All Defendants**

16.    Plaintiff realleges each and every allegation previously alleged as fully setforth herein.

17.    In or about January 2023, and in the City of Compton, Los Angeles County, California, the Gallardo, LLC's pumpstation had a value of $200,000.00.

18.    In or about January 2023, defendant removed Gallardo, LLC's pumpstation from the Compton Property and converted the same to its own use.

19.    Plaintiff demanded the immediate return of the above-mentioned property, but defendant failed and refused, and continues to fail and refuse, to return the property to plaintiff. (A copy of plaintiff's written demand for return of the property is attached hereto as Attachment "B" and made a part hereof.)

20.    In the event that the pumpstation is determined to have a lower value of $200,000, the as a proximate result of defendant's conversion, plaintiff in the amount to replace the converted equipment.

21.    The defendant's acts alleged above were willful, wanton, malicious, and oppressive, were undertaken with actual knowledge the defendants had no right to the property, had no court order to take

1  the property, and justify the awarding of exemplary and punitive

2  damages.

3  WHEREFORE, plaintiff prays judgment against defendants, and each of

4  them, as follows:

5  Declaratory Relief:

6      a. For a declaration that bulk tanks in question belong to

7         Gallardo, LLC and Airgas cannot remove the tanks from the

8         Compton Property or otherwise damage the tanks;

9      b. For issuance of a temporary restraining order, preliminary

10         injunction restraining Defendant Airgas and his/her agents,

11         servants, and employees, and each of them, from  removing,

12         from assigning, transferring, or disposing of and enjoining

13         defendant from removing Gallardo's bulk tanks from the

14         Compton Property.

15 Conversion:

16      c.  For the value of the property converted;

17      d. For damages for the proximate and foreseeable loss

18         resulting from defendant's conversion in the sum of

19         $200,000.00;

20      e. For punitive and exemplary damages;

21 For All Causes of Action:

22      f. For costs of suit herein incurred; and

23      g. For such other and further relief as the court may deem

24         proper.

25  Dated: 8/12/2024                    David Kestner

26                              David Kestner, Esq.

27

28

---

**COMPLAINT FOR DAMAGES**

ATTACHMENT "A"

# AIR COMMERCIAL REAL ESTATE ASSOCIATION
# STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- GROSS
## (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

1. **Basic Provisions ("Basic Provisions").**

1.1 **Parties:** This Lease (**"Lease"**), dated for reference purposes only __10/25/2018__ ,
is made by and between __GALLARDO, LLC__
_____ (**"Lessor"**)
and __COMPLETE WELDING AND CUTTING SUPPLY, LLC__
_____ (**"Lessee"**),
(collectively the **"Parties"**, or individually a **"Party"**).

1.2 **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease,
and commonly known as __401 N Long Beach Blvd, Compton, CA 90221__
located in the County of __LOS ANGELES__ , State of __CALIFORNIA__ ,
and generally described as (describe briefly the nature of the property and, if applicable, the **"Project"**, if the property is located within a Project)
__COMMERICAL PROPERTY (21,000 SQ. FT.)__
_____
_____ (**"Premises"**). (See also Paragraph 2)

1.3 **Term:** __EIGHT__ years and __ZERO__ months (**"Original Term"**) commencing __11/01/2018__
(**"Commencement Date"**) and ending __10/31/2026__ (**"Expiration Date"**). (See also Paragraph 3)

1.4 **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing
_____ (**"Early Possession Date"**). (See also Paragraphs 3.2 and 3.3)

1.5 **Base Rent:** $ __29,400.00__ per month (**"Base Rent"**), payable on the __FIRST__
day of each month commencing __11/01/2018__ . (See also Paragraph 4)

☐ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _____

1.6 **Base Rent and Other Monies Paid Upon Execution:**

(a) **Base Rent:** $ _____ for the period _____

(b) **Security Deposit:** $ __30,000.00__ (**"Security Deposit"**). (See also Paragraph 5)

(c) **Association Fees:** $ _____ for the period _____

(d) **Other:** $ _____ for _____

(e) **Total Due Upon Execution of this Lease:** $ _____ .

1.7 **Agreed Use:** _____
_____ (See also Paragraph 6)

1.8 **Insuring Party:** Lessor is the **"Insuring Party"**. The annual **"Base Premium"** is $ _____ (See also Paragraph 8)

1.9 **Real Estate Brokers:** (See also Paragraph 15 and 25)

(a) **Representation:** The following real estate brokers (the **"Brokers"**) and brokerage relationships exist in this transaction (check
applicable boxes):

☐ __NONE__ _____ represents Lessor exclusively (**"Lessor's Broker"**);

☐ __NONE__ _____ represents Lessee exclusively (**"Lessee's Broker"**); or

☐ __NONE__ _____ represents both Lessor and Lessee (**"Dual Agency"**).

(b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage
fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the
Base Rent) for the brokerage services rendered by the Brokers.

1.10 **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____
_____ (**"Guarantor"**). (See also Paragraph 37)

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STG-26-12/16E

1.11    **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☐ an Addendum consisting of Paragraphs _____ through _____ ;

☐ a plot plan depicting the Premises;

☐ a current set of the Rules and Regulations;

☐ a Work Letter;

☐ other (specify):_____

_____

_____

2.      **Premises.**

2.1    **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **Note: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2    **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs (**"Start Date"**), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems (**"HVAC"**), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date and that the surface and structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the **"Building"**) shall be free of material defects, and that the Unit does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense, except for the roof, foundations, and bearing walls which are handled as provided in paragraph 7. Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3    **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances (**"Applicable Requirements"**) that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building (**"Capital Expenditure"**), Lessor and Lessee shall allocate the cost of such work as follows:

(a)  Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)  If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay Interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

INITIALS

**PAGE 2 OF 19**

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STG-26-12/16E

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

2.4    **Acknowledgements.** Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5    **Lessee as Prior Owner/Occupant.** The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

3.    **Term.**

·3.1    **Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2    **Early Possession.** Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3    **Delay In Possession.** Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4    **Lessee Compliance.** Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.    **Rent.**

4.1    **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent (**"Rent"**).

4.2    **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future payments to be made by Lessee to be by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

4.3    **Association Fees.** In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.

5.    **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STG-26-12/16E

Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. **THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.**

6.    **Use.**

    6.1    **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

    6.2    **Hazardous Substances.**

        (a) **Reportable Uses Require Consent.** The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

        (b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

        (c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

        (d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. **No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.**

        (e) **Lessor Indemnification.** Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by

**PAGE 4 OF 19**

the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in Paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3 **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises. In addition, Lessee shall provide Lessor with copies of its business license, certificate of occupancy and/or any similar document within 10 days of the receipt of a written request therefor.

6.4 **Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of a written request therefor. Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

7. **Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1 **Lessee's Obligations.**

(a) **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), ceilings, floors, stairs, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee is also responsible for keeping the roof and roof drainage clean and free of debris. Lessor shall keep the surface and structural elements of the roof, foundations, and bearing walls in good repair (see paragraph 7.2). Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

**PAGE 5 OF 19**

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STG-26-12/16E

(b) **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, and (v) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d) **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay Interest on the unamortized balance but may prepay its obligation at any time.

7.2    **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee, except for the surface and structural elements of the roof, foundations and bearing walls, the repair of which shall be the responsibility of Lessor upon receipt of written notice that such a repair is necessary. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    **Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions.** The term **"Utility Installations"** refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term **"Trade Fixtures"** shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term **"Alterations"** shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. **"Lessee Owned Alterations and/or Utility Installations"** are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4    **Ownership; Removal; Surrender; and Restoration.**

(a) **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per Paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

(c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.    **Insurance; Indemnity.**

8.1    **Payment of Premium Increases.**

(a)  Lessee shall pay to Lessor any insurance cost increase (**"Insurance Cost Increase"**) occurring during the term of this Lease. Insurance Cost Increase is defined as any increase in the actual cost of the insurance required under Paragraph 8.2(b), 8.3(a) and 8.3(b), over and above the Base Premium as hereinafter defined calculated on an annual basis. Insurance Cost Increase shall include but not be limited to increases resulting from the nature of Lessee's occupancy, any act or omission of Lessee, requirements of the holder of mortgage or deed of trust covering the Premises, increased valuation of the Premises and/or a premium rate increase. The parties are encouraged to fill in the Base Premium in paragraph 1.8 with a reasonable premium for the Required Insurance based on the Agreed Use of the Premises. If the parties fail to insert a dollar amount in Paragraph 1.8, then the Base Premium shall be the lowest annual premium reasonably obtainable for the Required Insurance as of the commencement of the Original Term for the Agreed Use of the Premises. In no event, however, shall Lessee be responsible for any portion of the increase in the premium cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence.

(b)  Lessee shall pay any such Insurance Cost Increase to Lessor within 30 days after receipt by Lessee of a copy of the premium statement or other reasonable evidence of the amount due. If the insurance policies maintained hereunder cover other property besides the Premises, Lessor shall also deliver to Lessee a statement of the amount of such Insurance Cost Increase attributable only to the Premises showing in reasonable detail the manner in which such amount was computed. Premiums for policy periods commencing prior to, or extending beyond the term of this Lease, shall be prorated to correspond to the term of this Lease.

8.2    **Liability Insurance.**

(a)  **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an **"insured contract"** for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)  **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3    **Property Insurance - Building, Improvements and Rental Value.**

(a)  **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender or included in the Base Premium), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b)  **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c)  **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STG-26-12/16E

8.4   **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.**

(a)   **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b)   **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c)   **Worker's Compensation Insurance.** Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements. Such policy shall include a 'Waiver of Subrogation' endorsement. Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(d)   **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5   **Insurance Policies.** Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6   **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7   **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8   **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9   **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.   **Damage or Destruction.**

9.1   **Definitions.**

(a)   **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b)   **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c)   **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

**PAGE 8 OF 19**

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STG-26-12/16E

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2     **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3     **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4     **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5     **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6     **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. **"Commence"** shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7     **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

**PAGE 9 OF 19**

10.    **Real Property Taxes.**

10.1    **Definition.** As used herein, the term **"Real Property Taxes"** shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2

(a) **Payment of Taxes.** Lessor shall pay the Real Property Taxes applicable to the Premises provided, however, that Lessee shall pay to Lessor the amount, if any, by which Real Property Taxes applicable to the Premises increase over the fiscal tax year during which the Commencement Date Occurs ("Tax Increase"). Payment of any such Tax Increase shall be made by Lessee to Lessor within 30 days after receipt of Lessor's written statement setting forth the amount due and computation thereof. If any such taxes shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such taxes shall be prorated to cover only that portion of the tax bill applicable to the period that this Lease is in effect. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that the Tax Increase be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent. Such monthly payment shall be an amount equal to the amount of the estimated installment of the Tax Increase divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable Tax Increase is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable Tax Increase. If the amount collected by Lessor is insufficient to pay the Tax Increase when due, Lessee shall pay Lessor, upon demand, such additional sums as are necessary to pay such obligations. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

(b) **Additional Improvements.** Notwithstanding anything to the contrary in this Paragraph 10.2, Lessee shall pay to Lessor upon demand therefor the entirety of any increase in Real Property Taxes assessed by reason of Alterations or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.3    **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Tax Increase for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4    **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting.**

12.1    **Lessor's Consent Required.**

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. **"Net Worth of Lessee"** shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

(g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2    **Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, the deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    **Default; Breach; Remedies.**

13.1    **Default; Breach.** A **"Default"** is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A **"Breach"** is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee. In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STG-26-12/16E

ATTACHMENT "B"

kestner Law <kestnerlaw@gmail.com>

# Traonis Fuels Chap 11 and Gallardo LLC Compton property
9 messages

**kestner Law** <kestnerlaw@gmail.com>                              Fri, Nov 18, 2022 at 8:00 AM
To: kgood@potteranderson.com

Dear Counsel,

I represent Gallardo LLC in a number of civil matters which are pending against Magnegas Welding Supplies West, LLC and the Magnegas Real Estate Holdings, LLC

I request that you inform me whether  Magnegas Real Estate Holdings, LLC will assume or reject its lease with my client concerning the Compton property.

Additionally, the tanks that are fixtures at the Compton property are not the property of your client. Please affirm that your client will not remove these tanks.



I hope the picture helps.

In the action pending in Los Angeles and Orange County California, I have not received a notice of stay.

Sincerely,

David Kestner, Esq.
--

**Law Offices of David Kestner and Associates, APC.**
**410 East Merced Avenue**
**West Covina, California 91790**
**Tel: 888-898-7322 Fax: 213-867-9945**

**kestner Law** <kestnerlaw@gmail.com>                              Fri, Nov 18, 2022 at 10:36 AM
To: kgood@potteranderson.com

Dear Ms. Good,

I am being told by my client fixtures at the Compton Property are:
There are four tanks:
1. oxygen 6,000 gallons;
2. argon 1500 gallons;

3. nitrogen 1500 gallons;
4. 9 ton CO2
5. Propane tank that belongs to a third party.
Additionally,
There is/are:
CO2 pump;
Scale;
heat exchanger;
3 cryogenic pumps;
oxygen, argon, nitrogen, manifolds with control panels;
3 evaporators.
[Quoted text hidden]

---

**Ryan, Jeremy W.** <jryan@potteranderson.com>                    Wed, Nov 30, 2022 at 9:02 AM
To: "kestnerlaw@gmail.com" <kestnerlaw@gmail.com>
Cc: "Good, L. Katherine" <kgood@potteranderson.com>

Mr. Kestner,

I am the attorney primarily handling the CA sale to Airgas, so please direct future inquiries to me.  And I apologize for the delay in responding, this was overlooked in the holidays.  Your client was served with the motion seeking approval of the California transaction and I am presuming the below inquiry is in response to receipt of such motion.

It is Taronis's intent to sell all Fixtures and Supplies, as that term is defined in that certain Asset Purchase Agreement dated February 22, 2019 between your client and Taronis Technologies, Inc., of which Taronis Fuels, Inc. is the successor, which are located at the Compton Property.  Pursuant to the APA, any such Fixtures and Supplies in place at the time of the APA were expressly conveyed by your client.  To the extent that Taronis brought additional Fixtures and Supplies onto the Compton Property, those will also be sold.

Taronis will also be assuming and assigning the lease for the Compton Property to Airgas.

The objection deadline was set forth in the notice accompanying the motion and it is December 3 at 4:00 p.m. e.s.t.

Regards,

Jeremy



**Jeremy W. Ryan | Partner**
Potter Anderson & Corroon LLP | 1313 N. Market Street, 6th Floor | Wilmington, DE 19801-6108
T +1 302.984.6108 | F +1 302.658.1192
jryan@potteranderson.com | potteranderson.com

The information contained in this email message and any attachments is intended only for the addressee and is privileged, confidential, and may be protected from disclosure. Please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this email message in error, please do not read this message or any attached items. Please notify the sender immediately and delete the email and all attachments, including any copies. This email message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which they are received and opened. However, it is the responsibility of the recipient to ensure that the email and any attachments are virus-free, and no responsibility is accepted by Potter Anderson & Corroon LLP for any loss or damage arising in any way from their use.

---

**From:** kestner Law <kestnerlaw@gmail.com>
**Sent:** Friday, November 18, 2022 1:37 PM
**To:** Good, L. Katherine <kgood@potteranderson.com>
**Subject:** [EXT] Re: Traonis Fuels Chap 11 and Gallardo LLC Compton property

** This email originated from outside of Potter Anderson's network. Please exercise caution before clicking links, opening attachments, or responding to this message. **

---

Dear Ms. Good,

I am being told by my client fixtures at the Compton Property are:

There are four tanks:

1. oxygen 6,000 gallons;

2. argon 1500 gallons;

3. nitrogen 1500 gallons;

4. 9 ton CO2

5. Propane tank that belongs to a third party.

Additionally,

There is/are:

CO2 pump;

Scale;

heat exchanger;

3 cryogenic pumps;

oxygen, argon, nitrogen, manifolds with control panels;

3 evaporators.


On Fri, Nov 18, 2022 at 8:00 AM kestner Law <kestnerlaw@gmail.com> wrote:

> Dear Counsel,
>
> I represent Gallardo LLC in a number of civil matters which are pending against Magnegas Welding Supplies West, LLC and the Magnegas Real Estate Holdings, LLC
>
> I request that you inform me whether  Magnegas Real Estate Holdings, LLC will assume or reject its lease with my client concerning the Compton property.
>
> Additionally, the tanks that are fixtures at the Compton property are not the property of your client. Please affirm that your client will not remove these tanks.

8/12/24, 8:12 AM        Case 2:24-cv-07393-WLH-AJR    Document 1-1    Filed 08/29/24    Page 27 of 34    Page
                                         Gmail - Guardian Fuels Chap 11 mil Guardian, at Compton property
                                         ID #:35



I hope the picture helps.

In the action pending in Los Angeles and Orange County California, I have not received a notice of stay.

Sincerely,

David Kestner, Esq.

--

**Law Offices of David Kestner and Associates, APC.**

**410 East Merced Avenue**

**West Covina, California 91790**

**Tel: 888-898-7322 Fax: 213-867-9945**

[Quoted text hidden]

---

**kestner Law** <kestnerlaw@gmail.com>                                    Fri, Dec 2, 2022 at 2:16 PM
To: "Ryan, Jeremy W." <jryan@potteranderson.com>

Dear Jeremy, just wanted to let you know that those tanks are fixtures of the property and they belong to guyardo GAL
LAR DO, LLC. When I say those tanks I mean the ones that I pointed out in the picture I sent to I guess the main council
for the bankruptcy.

Tyrone does not have the license or the ownership in which to transfer those tanks to a 3rd party.

They can be used as part of renting the property.

If there's been any syntax error that I have to forgive me I'm on place where I don't have my glasses and I am dictating.

[Quoted text hidden]

---

**4 attachments**



image.png
979K



imagea06625.JPG
6K



image.png
979K



imagea06625.JPG
6K

---

**Ryan, Jeremy W.** <jryan@potteranderson.com>                    Fri, Dec 2, 2022 at 5:58 PM
To: kestner Law <kestnerlaw@gmail.com>
Cc: "Good, L. Katherine" <kgood@potteranderson.com>, "McNeill, R. Stephen" <rmcneill@potteranderson.com>

Mr. Kestner,

We disagree with your unfounded assertions which are contrary to documents executed by your ultimate principal, Guillermo Galardi  Gallardo LLC has been served with the motion and has notice. We will be seeking an order from the bankruptcy court seeking authority to sell all of the Fixtures.

Regards,

Jeremy




**Jeremy W. Ryan | Partner**
Potter Anderson & Corroon LLP | 1313 N. Market Street, 6th Floor | Wilmington, DE 19801-6108
T +1 302.984.6108 | F +1 302.658.1192
jryan@potteranderson.com | potteranderson.com


The information contained in this email message and any attachments is intended only for the addressee and is privileged, confidential, and may be protected from disclosure. Please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this email message in error, please do not read this message or any attached items. Please notify the sender immediately and delete the email and all attachments, including any copies. This email message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which they are received and opened. However, it is the responsibility of the recipient to ensure that the email and any attachments are virus-free, and no responsibility is accepted by Potter Anderson & Corroon LLP for any loss or damage arising in any way from their use.

On Dec 2, 2022, at 5:17 PM, kestner Law <kestnerlaw@gmail.com> wrote:

[Quoted text hidden]

---

**kestner Law** <kestnerlaw@gmail.com>                           Sat, Dec 3, 2022 at 5:21 AM
To: "Ryan, Jeremy W." <jryan@potteranderson.com>

Unfounded so you know who purchases those tanks you know whether they were attached or wasn't attached to the property when Gallardo llc  purchased the Compton property.

We must be talking about Apples and oranges

[Quoted text hidden]

---

**2 attachments**


**image41303f.JPG**
6K


**image41303f.JPG**
6K

---

**kestner Law** <kestnerlaw@gmail.com>                          Sun, Dec 4, 2022 at 11:41 AM
To: "Ryan, Jeremy W." <jryan@potteranderson.com>

There is a little problem here. Guillermo sold the assets it owned to Magnegas or Tarnois. But that doesn't mean that he sold the assets to Gallardo, LLC.

Jeremy, I don't think what I am saying is hard to fetch. Corporations, limited liability companies are  legal persons. They way you go about it suggest that whatever Mr. Gallardo had an interest in he sold it when he sold the assets of Complete Cutting and Welding Supplies, Inc. which is not correct.

I could  be wrong as to the tank but there is nothing I found in the transactional documents calling out those SPECIFIC tanks. That property was a welding supply property when Gallardo LLC purchased it.

[Quoted text hidden]

---

**Ryan, Jeremy W.** <jryan@potteranderson.com>                  Sun, Dec 4, 2022 at 11:58 AM
To: kestner Law <kestnerlaw@gmail.com>
Cc: "Good, L. Katherine" <kgood@potteranderson.com>

We disagree and will be seeking to sell those tanks. You and your client have notice of this and of the procedures by which objections must be asserted in the bankruptcy court.

---


**Jeremy W. Ryan | Partner**
Potter Anderson & Corroon LLP | 1313 N. Market Street, 6th Floor | Wilmington, DE 19801-6108
T +1 302.984.6108 | F +1 302.658.1192
jryan@potteranderson.com | potteranderson.com

The information contained in this email message and any attachments is intended only for the addressee and is privileged, confidential, and may be protected

from disclosure. Please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this email message in error, please do not read this message or any attached items. Please notify the sender immediately and delete the email and all attachments, including any copies. This email message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which they are received and opened. However, it is the responsibility of the recipient to ensure that the email and any attachments are virus-free, and no responsibility is accepted by Potter Anderson & Corroon LLP for any loss or damage arising in any way from their use.

On Dec 4, 2022, at 2:42 PM, kestner Law <kestnerlaw@gmail.com> wrote:

> ** This email originated from outside of Potter Anderson's network. Please exercise caution before clicking links, opening attachments, or responding to this message. **

There is a little problem here. Guillermo sold the assets it owned to Magnegas or Tarnois. But that doesn't mean that he sold the assets to Gallardo, LLC.

Jeremy, I don't think what I am saying is hard to fetch. Corporations, limited liability companies are legal persons. They way you go about it suggest that whatever Mr. Gallardo had an interest in he sold it when he sold the assets of Complete Cutting and Welding Supplies, Inc. which is not correct.

I could be wrong as to the tank but there is nothing I found in the transactional documents calling out those SPECIFIC tanks. That property was a welding supply property when Gallardo LLC purchased it.

On Fri, Dec 2, 2022 at 5:58 PM Ryan, Jeremy W. <jryan@potteranderson.com> wrote:
> Mr. Kestner,
>
> We disagree with your unfounded assertions which are contrary to documents executed by your ultimate principal, Guillermo Galardi Gallardo LLC has been served with the motion and has notice. We will be seeking an order from the bankruptcy court seeking authority to sell all of the Fixtures.
>
> Regards,
>
> Jeremy
>
> 
> **Jeremy W. Ryan | Partner**
> Potter Anderson & Corroon LLP | 1313 N. Market Street, 6th Floor | Wilmington, DE 19801-6108
> T +1 302.984.6108 | F +1 302.658.1192
> jryan@potteranderson.com | potteranderson.com
>
> [Quoted text hidden]

[Quoted text hidden]


**image41303f.JPG**
6K

---

kestner Law <kestnerlaw@gmail.com>                                      Fri, Aug 2, 2024 at 9:39 AM
To: "Ryan, Jeremy W." <jryan@potteranderson.com>

Mr. Rysan,

If you received an order from the court concerning the bulk tanks, would you be so kind and share it with me?

ATTACHMENT "C"

## Negotiation Request Regarding Lease Breach by Airgas

Info <info@kestner.lawyer>

Mon 4/22/2024 10:39 AM

To:chris.seekatz@airgas.com <chris.seekatz@airgas.com>
Cc:cwsinfo7@gmail.com <cwsinfo7@gmail.com>;guillermo@completewelding.com <guillermo@completewelding.com>

Dear Mr. Seekatz, I was instructed to forward the below email to you. All the best, David Kestner

Dear Chris Seekatz,

I hope this letter finds you well. We, Gallardo LLC, have received your communication expressing Airgas's intention to breach the lease agreement currently in effect for 401 N Long Beach Blvd, Compton, CA property. We understand that circumstances may have arisen which necessitate this decision on your part.

As representatives of Gallardo LLC, we value the relationship we have fostered with Airgas over the duration of our lease agreement. We believe in open communication and constructive dialogue to resolve any challenges that may arise.

Upon reviewing the terms of the lease agreement and that Airgas wants to terminate at the end of August 2024, we note that there are still 18 months remaining, with a total remaining commitment of $520,200.
Additionally, we acknowledge you removed certain equipment belonging to Gallardo LLC right after Airgas was assigned the lease from Magnegas.

We need Airgas to either do the re-installation all the equipment removed or compensate Gallardo LLC for its loss.

In light of these developments, we would like to initiate negotiations with the aim of reaching an amicable resolution for both parties. Our primary objectives in these negotiations are to ensure fair compensation
for the re-installation of the equipment removed by Airgas.

We propose a meeting at your earliest convenience to discuss the following points:

1. The re-installation of the equipment removed by Airgas. The facility
can be fully functional to fill/packaging industrial gases and return
back to the original status at the time of the lease.
2. Compensation for the removal of Gallardo LLC equipment/property
necessary to fill industrial gases. (Replacement of all the missing
equipment and the cost of installation)
3. Options for either the continuation of the lease agreement with
necessary adjustments or the early termination of the lease under
mutually agreeable terms.
4. Any additional concerns or requirements from either party regarding
the ongoing relationship between Gallardo LLC and Airgas.

We believe that through open communication and a spirit of collaboration, we can find a solution that meets the needs of both parties. Please let us know your availability for a meeting, and we will
make the necessary arrangements.

Thank you for your attention to this matter. We look forward to a productive discussion and a mutually beneficial outcome.

Sincerely,

Guillermo Gallardo
President
Gallardo LLC

ATTCHEMENT "D"

## Re: Negotiation Request Regarding Lease Breach by Airgas

SEEKATZ, Chris <chris.seekatz@airgas.com>

Wed 7/3/2024 2:05 PM

To:Info <info@kestner.lawyer>
Cc:guillermo@completewelding.com <guillermo@completewelding.com>;cwsinfo7@gmail.com <cwsinfo7@gmail.com>

David,

We arrived at the $250k amount by estimating our remaining liability if we were to sublease the space at a discount, and pay the difference. We chose to simply offer that amount up front.

As far as the bulk tanks and other equipment go, it's clearly annotated in Section 2.1 of the Asset Purchase Agreement that you provided that all the assets associated with the Seller's business were included in the original sale to Taronis. All of these assets were then included in the sale to Airgas, including the bulk tanks.

I need to apologize because I've been asked to change direction on our buyout proposal. Region and Division leadership would like to increase our cash offer from $250k to $350k, but to remove the tanks from the discussion. For a variety of reasons, they intend to remove the tanks. Please let me know if this is acceptable to ownership.

Thanks!